**Lane PASTOR, Appellant,**

v.

**Irving A. CANE, Gertrude Cane and Beatrice Cohen, Appellees.**

No. 1980.

Municipal Court of Appeals for the District of Columbia.

Argued May 6, 1957.

Decided July 10, 1957.

Ewing Laporte, Washington, D. C., for appellant.

Allan L. Kamerow, Washington, D. C., with whom Stanley H. Kamerow, Washington, D. C., was on the brief, for appellees.

Before HOOD and QUINN, Associate Judges, and CAYTON (Chief Judge, Retired) sitting by designation under Code, § 11–776(b).

CAYTON, Acting Judge.

The question to be decided is whether the trial court ruled correctly in refusing to allow a commission to a broker in connection with an agreement for the sale of a dry-cleaning business. The broker was appellant Pastor; the vendors were appellees Cane and Cohen, owners of all capital stock in the business; the purchaser was Mrs. Aquilino, who was produced by her son, one Benedetti, a salesman who worked for Pastor. The contract signed by the parties provided for the sale of all the capital stock of the corporation and also contained the following provisions pertinent to this appeal:

"1. Sellers are to furnish buyer upon settlement with a complete statement in writing by a certified public accountant of all outstanding debts and liabilities of said corporation.

\* \* \* \* \* \*

"5. This agreement is subject to the following: (a) that sellers show by corporate records average over-the-counter business by said corporation of approximately $750.00 weekly, plus wholesale business of approximately $200.00 weekly for the year last past; (b) transfer to buyer of lease of premises, in which the corporate business is being conducted, for a remaining term of approximately two years at rental of $400.00 monthly, and containing option for renewal for five additional years at rental not to exceed $500.00 monthly; (c) a trial period for buyer of two weeks beginning June 25, 1956, and settlement shall be made as of said date, to-wit, July 9th, 1956."

The broker sued the three vendors for the commission specified in the contract, charging them with refusal to complete the sale. The trial court found for defendants. Appellant charges that the decision was wrong as a matter of law and that on the undisputed evidence he was entitled to recover.

It was not disputed that at the first of two settlement meetings defendants did not produce the lease; that they had not completed with creditors a check of oustanding liabilities; that defendant Irving Cane was not present and that neither of the defendants who were present had any power of attorney to transfer his stock. It was also undisputed that at the second meeting Mr. Cane was again absent, and it does not appear that either of the other defendants then had authority to transfer his stock, or that defendants were then prepared to meet the other contract conditions.

An accountant who kept the corporation books and who had been present at the two meetings was called as a witness for plaintiff and testified that he could not tell from company records what part of the business was done over-the-counter and what part was wholesale; that he had told Benedetti during the trial period that the records did not show wholesale business separately, and that he had so stated at the first settlement meeting. He testified that for a period of nine months immediately preceding the settlement meetings the average weekly "gross business done" was $797.07.

Either at the first settlement meeting, or prior thereto, it developed that the Canes owned a half interest in another cleaning business which supplied wholesale business to defendants' corporation. There was some discussion about Mrs. Aquilino's buying that half interest as well, to insure a flow of the wholesale business. (We shall refer to this again.)

The above and other undisputed evidence clearly tended to show that vendee was ready, able and willing to complete the purchase, but that the vendors failed to meet the conditions imposed upon them by their contract. And if nothing more had been presented plaintiff would have been entitled to recover as a matter of course. Shaffer v. Berger, D.C.Mun.App., 81 A.2d 469. See also Dotson v. Milliken, 27 App. D.C. 500, affirmed 209 U.S. 237, 28 S.Ct. 489, 52 L.Ed. 768.

This leads us to the basic area of dispute in the case. Plaintiff testified on direct examination that at the settlement meetings (on July 12 and 16, 1956) defendants insisted on withdrawing rent and utility deposits amounting to something over $1,200 and refused to close unless they were allowed to do so. On cross-examination plaintiff said he thought there had been no such conversations prior to the settlement meetings; and that no oral agreement was made to that effect.

The buyer, Mrs. Aquilino, who testified by deposition, recalled nothing said at the July 12 meeting concerning rent and utility deposits, and that the matter of the deposits was first raised at the July 16 meeting. She said she was ready to make settlement and complete the purchase at both meetings. She also said she first learned that vendors were demanding the deposit money when she was "ready to make the settlement." She then felt that she was not entitled to the rent deposit, but was entitled to the utility deposits, and was unwilling to accept performance if those were withdrawn. But she said the deal fell through because of vendors' demand for the rent and utility deposits and because they "wanted extra money for the wholesale business."

One of the defendants, Mrs. Cohen, testified that defendants were to be paid back a rent deposit of $800. She said there were utility deposits "up for the corporation" and that she told plaintiff prior to the settlement meetings that the deposits would be withdrawn and the buyer would have to put them up.

■ It is far from clear from the verbal findings announced by the trial judge just what he ruled with reference to defendants' right to demand the deposits, or what effect such demand had on the collapse of the deal. He said the evidence "[led him] to believe" the vendor, Mrs. Cohen; but he noted that these deposits were not mentioned either in the listing agreement or in the contract. There was no evidence that the purchaser, Mrs. Aquilino, was ever told prior to the settlement meetings that the vendors would insist on withdrawing these funds. Hence the judge could not have meant that the purchaser had knowledge of such a condition, or agreed to it when the contract was signed or thereafter. The next question is whether defendants have met their burden of showing that plaintiff-broker had such knowledge prior to the signing of the agreement and in some manner violated a duty to them, or caused them ostensibly to accept a purchaser who did not in fact meet the terms specified; or whether they showed that plaintiff acted in some other manner inconsistent with his duty to the principals.

■ Even if the judge had found (and nothing in the record indicates it) that the broker was informed of the vendors' intentions, this would not justify rejecting his claim, for there was no word of testimony that the vendors ever took such a position or made any suggestion of such a demand *at or before* the signing of the sales contract. And it would be a novel principle indeed which would permit stockholders to agree to transfer all of their corporate stock and then later assert the right to withdraw certain cash assets of the corporation which had not been specifically excluded in advance, or even mentioned.

In the course of his findings the judge made remarks to the effect that after the signing of the listing agreement "Mr. Benedetti's mother came into the picture,

**98**

and that introduces a reflection as to whether this broker was dealing as a broker or on his own account", and that Mr. Benedetti "was a party in interest"; although the judge granted that such was not controlling and that he was merely making "an observation on the weight of the evidence." Nothing in the record reflects any impropriety or even lack of candor in this situation. It seeems to us that the judge drew unwarranted inferences from the fact that Benedetti, an employee of plaintiff, interested his mother in becoming the purchaser. The record makes it clear that Mrs. Cohen, the only defendant who testified on the point, knew from the beginning that Benedetti was an employee of plaintiff and knew prior to the signing of the sales contract that Benedetti had obtained his mother as the prospective purchaser. Mrs. Cohen testified that Benedetti was at the establishment during the two weeks' trial period provided in the agreement; also, defendants' accountant testified that it was Benedetti who consulted with him during that period. This leaves no doubt that defendants knew all along who Mrs. Aquilino was, and that there was no attempt to deceive the sellers or conceal the fact that she was buying the business for her son, Benedetti. That being so, it was wrong to suggest that there was in this respect some breach of duty by Benedetti's employer.

Standards have been clearly stated which govern in such situations. We have been told that "while a satisfactory conclusion may be reached through an inference from established facts, there must still be facts proved from which the inference can be drawn. No inference of fact may be drawn from a premise which is wholly uncertain." Groner, C. J., in Kenney v. Washington Properties, 76 U.S.App.D.C. 43, 128 F.2d 612, 146 A.L.R. 1. See also Blackhawk Hotels Company v. Bonfoey, 8 Cir., 1955, 227 F.2d 232.

From all that we have gleaned from the record the decision in this case seems to have been based on implications and inferences—perhaps even on suspicions—none of them having support in the record. It follows that a new trial must be had.

Reversed with instructions to award a new trial.